# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| TYLER SWAILS on behalf of himself and all others similarly situated,<br><br>       Plaintiff,<br><br> v.<br><br>ARCHERY TRADE ASSOCIATION, INC; BOWTECH INC.; BPS DIRECT, LLC d/b/a BASS PRO SHOPS; CABELA'S LLC; DICK'S SPORTING GOODS, INC.; HOYT ARCHERY, INC.; JAY'S SPORTING GOODS; KINSEY'S OUTDOORS, INC.; LANCASTER ARCHERY SUPPLY, INC.; MATHEWS ARCHERY, INC.; and PRECISION SHOOTING EQUIPMENT, INC.,<br><br>       Defendants. | Case No.<br><br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................... 1

II.  JURISDICTION AND VENUE ................................................................ 4

III.  PARTIES .................................................................................................. 5

A. Plaintiff .................................................................................................. 5

B. Defendants ............................................................................................ 6

1. Manufacturer Defendants ............................................................. 6

2. Retailer Defendants ...................................................................... 7

C. Trade Association Defendant ................................................................ 8

D. Co-Conspirator and Agents .................................................................. 9

IV.  FACTUAL ALLEGATIONS ................................................................... 10

A.  The Archery Trade Association Performed a Central Role in the
Conspiracy ........................................................................................... 10

1.  Membership in the ATA ........................................................... 10

2.  The ATA's Board of Directors ................................................. 11

3.  The ATA's Retail Council ........................................................ 11

4.  The ATA's Trade Shows ........................................................... 12

B.  Defendants' Agreement to Artificially Raise, Fix, Maintain, or Stabilize
Prices of Archery Products ................................................................. 13

1.  The ATA Begins Actively Pushing MAP Policies Across the
Archery Products Industry ........................................................ 14

2  The ATA Issues Call to Action on Adherence to and
Endorsement of MAP Policies for the Archery Products
Industry ..................................................................................... 16

i

3.     The Archery Products Industry Embraces MAP Policies as Defendants Urge Their Continued Enforcement....................20

4.     The ATA Provides Additional Resource that Facilitate the Conspiracy to Fix Prices and Exchange Competitively Sensitive Information of Archery Products...........................27

5.     The ATA Launches Members-Only ATA Retail Business Tracker Survey. ……………………………………………34

C.     Defendants' Suppression of Competition through Information Exchange ..............................................................36

D.     Defendants' Conduct Has Had Anticompetitive Effects ...............39

E.     The Relevant Market for the Conspiracy is the Market for Archery Products.............................................................41

V.     FRAUDULENT CONCEALMENT & EQUITABLE TOLLING .............43

VI.     CONTINUING VIOLATION ...................................................44

VII.     CLASS ACTION ALLEGATIONS............................................46

VIII.     CLAIMS FOR RELIEF .......................................................49

IX.     REQUEST FOR RELIEF......................................................52

X.     DEMAND FOR JURY TRIAL.................................................54

Plaintiff Tyler Swails ("Plaintiff") individually and on behalf of all other similarly situated, brings this actino against Archery Trade Association, Inc; Bowtech Inc.; BPS Direct, LLC d/ba/ Bass Pro Shops; Cabela's LLC; Dick's Sporting Goods, Inc.; Hoyt Archery, Inc.; Jay's Sporting Goods; Kinsey's Outdoors, Inc.; Lancaster Archery Supply, Inc.; Mathews Archery, Inc.; and Precision Shooting Equipment, Inc (collectively, "Defendants" unless delineated otherwise).   Plaintiff, individually and and on behalf of all others similarly situated, demands a trail by jury on all counts for which a trial by jurs is allowed and, in support of his complaint, alleges as follows:

## I.    INTRODUCTION

1.    This action alleges that Defendants' unlawful contract, combination or conspiracy to fis the prices ocoordinated horizontal conduct was a *per se* violation of the federal antitrust laws. Plaintiff also alleges that under Section 1 of the Sherman Act, Defendants' agreement to unlawfully exchange competitively sensitive information amongst Archery Products retailers and producers violates the rule of reason

2.    Beginning no later than January 1, 2014, Defendants conspired, colluded, and entered into an agreement to artificially raise, fix, maintain, or stabilize prices of Archery Products[1] at supracompetitive levels. Defendants' actions resulted in Plaintiff and members of the Class paying supracompetitive prices for Archery Products in the United States and its territories. Defendants' anticompetitive conduct, described further herein,

_____

[1] As defined below, "Archery Products" consists of bows, arrows, arrowpoints, targets, and accessories.

1

violates Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

3.    Defendants are Archery Products manufacturers Bowtech Inc. ("Bowtech"); Hoyt Archery, Inc. ("Hoyt"); Mathews Archery, Inc. ("Mathews"); and Precision Shooting Equipment, Inc. ("PSE") (collectively "Manufacturer Defendants"), multi-channel sporting goods retailers BPS Direct, LLC d/b/a Bass Pro Shops ("Bass Pro Shops"); Cabela's LLC ("Cabela's"); Dick's Sporting Goods, Inc. ("Dick's Sporting Goods"); Jay's Sporting Goods, Inc d/b/a Jay's Sporting Goods, ("Jay's Sporting Goods"); Kinsey's Outdoors, Inc. ("Kinsey's"); and Lancaster Archery Supply, Inc. ("Lancaster") (collectively "Retailer Defendants"), and industry trade association Archery Trade Association, Inc. ("ATA") as well as co-conspirator software producers TrackStreet, Inc. ("TrackStreet") and NeuIntel LLC, d/b/a PriceSpider f/k/a Oris Intelligence ("Oris") (collectively, "Software Co-Conspirators").

4.    The Manufacturer Defendants include many of the most popular brands in the archery industry, and the Retailer Defendants include many of the largest sporting goods retailers in the United States.

5.    The ATA is the primary trade association for the Archery Products industry, and its membership consists of manufacturers, distributors, retailers, and other participants in the supply chain for the manufacture, distribution and sale of Archery Products – specifically excluding consumers. The has recognized that "all sectors of the industry are ATA members." The ATA includes more than 2500 bueinssess and organizations.   Its size gives its significant power and sway in the Archery Products industry, and in turn, the

2

Manufacturer and Retailer Defendants exercised significant and uninterrupted influence over the ATA, with Defendants occupying several seats on the ATA Board of Directors in throughout the conspiracy.

6.      From at least January 1, 2014, Defendants conspired to establish, maintain and enforce price floors for specific products through the use of Minimum Advertised Price ("MAP") policies. This was intended to – and did – eliminate price competition and increase profit margins for manufacturers and retailers.

7.      The manufacturers and retailers used the ATA to "police" the conspiracy – that is, to confirm that conspirators are following the MAP. The ATA encouraged the other conspirators to adhere to the conspiracy while assuring those Defendants that the others were doing the same.   As the ATA explained to its member manufacturers and retailers that MAP policies "***level the playing field for all retailers, and eliminate the 'race to the bottom' that would manufacturers would occur if retailers endlessly competed to reduce prices***." The ATA acknowledged the adhering to a MAP policy would   "ensure[] all retailers compete fairly and evenly on service instead of price" and would help small businesses "compete and sell on service and value, rather than waging price wars with other retailers."

8.      The Manufacturer and Retailer Defendants, through the ATA, also suppressed competition and monitored adherence to the conspiracy by regularly and continuously exchanging competitively sensitive information, including:

a.      industry surveys prepared by the ATA and provided to the Manufacturer and Retailer Defendants., available free to members, such as the quarterly ATA Retail

Trend Tracker Survey, which "gathers insight from retailers across the country to help members adapt to changing conditions regionally as well as to compare your business to what is happening nationally. The report includes hard data for trends in archery sales broken down by bow type, services, and more, as well as customer buying habits and demographics."

b.      ATA presentations at its annual trade show, based on surverys and compiled data, to allow ATA members to compare their prices to those of their competitors.

c.      opportunities for Manufacturer and Retailer Defendants to meet and exchange competitively sensitive information, such as the annual ATA trade show.

9.      Defendants' conspiracy injured persons and entities that purchased Archery Products directly from the Manufacturer Defendants or their co-conspirators, including but not limited to individuals who purchased Archery Products directly from one of the Retailer Defendants or individuals who purchased Archery Products from retail stores that purchased Archery Products directly from one of the Manufacturer Defendants. But for Defendants' conspiracy and unlawful acts in furtherance, Plaintiff and members of the Class would have paid less for Archery Products than they did during the Class Period. Plaintiff, on behalf of himself and Class Members, seeks to recover the overcharges they paid.

## II.      JURISDICTION AND VENUE

10.      This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 & 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26,

11.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337.

12.     Venue is proper in this District under 15 U.S.C. §§ 15(a) & 22, and 28 U.S.C. § 1391(b), (c), and (d) because, during the Class Period, Defendants resided, transacted business, were found, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

13.     During the Class Period, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States and its territories.

14.     During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States Mail, to effectuate their illegal scheme.

15.     Defendants' conduct also had a substantial effect on the intrastate commerce of each of the United States and the District of Columbia.

16.     This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. Defendants' unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

III.    **PARTIES**

      A.    **Plaintiff**

17.    Plaintiff Tyler Swails is a Michigan resident. During the class period, Plaintiff purchased Archery Products that were manufactured by one or more of the Manufacturer Defendants and sold by one of the Retailer Defendants. The Archery Products that Plaintiff purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein.

18.    Plaintiff was injured in his business or property as a direct, proximate, and material result of Defendants' violations of law.

**B.    Defendants**

**1.    Manufacturer Defendants**

19.    Defendant Bowtech Inc. ("Bowtech") is a Delaware corporation with its primary place of business at 90554 Highway 99 N., Eugene Oregon. Throughout the Class Period, Bowtech was a member of the ATA, produced and sold Archery Products subject to Minimum Advertised Pricing Policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

20.    Defendant Hoyt Archery, Inc. ("Hoyt") is a Utah Corporation with its primary place of business at 593 N. Wright Brothers Dr., Salt Lake City, Utah. Throughout the Class Period, Hoyt was a member of the ATA, produced and sold Archery Products subject to Minimum Advertised Pricing Policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

21.    Defendant Mathews Archery, Inc. ("Mathews") is a Wisconsin corporation with its primary place of business at 919 River Road, Sparta, Wisconsin. Throughout the Class Period, Mathews was a member of the ATA, produced and sold Archery Products

6

subject to Minimum Advertised Pricing Policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

22.    Defendant Precision Shooting Equipment, Inc. ("PSE") is a Delaware corporation with its primary place of business at 2727 North Fairview Ave., Tuscon, Arizona. Throughout the Class Period, PSE was a member of the ATA, produced and sold Archery Products subject to Minimum Advertised Pricing Policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

## 2.    Retailer Defendants

23.    Defendant Cabela's LLC was a Delaware limited liability company with its primary place of business at 1 Cabela Drive, Sidney, Nebraska. In 2017, Cabela's was acquired by Bass Pro Shops. Throughout the Class Period and until its acquisition, Cabela's was a member of the ATA, sold Archery Products subject to Minimum Advertised Pricing Policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

24.    Defendant Dick's Sporting Goods is a Delaware corporation with its primary place of business at 345 Court Street, Coraopolis, Pennsylvania. Throughout the Class Period, Dick's was a member of the ATA, sold Archery Products subject to Minimum Advertised Pricing Policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

25.    Defendant Jay's Sporting Goods, Inc. d/b/a Jay's Sporting Goods, ("Jay's Sporting Goods") is a Michigan corporation with its primary place of business at 8800 S.

7

Clare Ave., Clare, Michigan. Throughout the Class Period, Dick's was a member of the ATA, sold Archery Products subject to Minimum Advertised Pricing Policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

26.    Defendant Kinsey's Outdoors, Inc. is a Pennsylvania corporation with its primary place of business at 1660 Steelway Drive, Mount Joy, Pennsylvania. Throughout the Class Period, Kinsey's was a member of the ATA, sold Archery Products subject to Minimum Advertised Pricing Policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

27.    Defendant Lancaster Archery Supply, Inc. is a Pennsylvania corporation with its primary place of business at 2195A Old Philadelphia Pike, Lancaster, Pennsylvania. . Throughout the Class Period, Lancaster was a member of the ATA, sold Archery Products subject to Minimum Advertised Pricing Policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

### C.    Trade Association Defendant

28.    Defendant Archery Trade Association ("ATA") is Virginia corporation with its primary place of business at 117 South Valley, New Ulm, Minnesota. ATA is a members-only trade association that works to further the economic interests of participants in the Archery Products industry. Throughout the Class Period, the ATA was an active participant in the conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States. Throughout the Class Period, the ATA facilitated exchanges among the Manufacturer and Retailer Defendants of detailed, non-public, competitively

8

sensitive information regarding, among other things, prices, capacity, demand, sales volume, future sales strategy, and other key pricing and sales metrics in furtherance of the conspiracy.

### D.    Co-Conspirators and Agents

29.    Various other persons, firms and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co- conspirators, whether or not named as defendants in this Complaint.

30.    Whenever reference is made to any act of a corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

31.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

32.    Neuintel LLC, d/b/a PriceSpider, f/k/a Oris Intelligence ("Oris") is a California corporation with its primary place of business at 20 Pacifica, Suite 1000, Irvine, California. Oris created and provided software to Defendants that allowed Defendants to police and enforce their MAP policies in order to raise prices on Archery Products. Throughout the Class Period, Oris participated in the conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

33.    TrackStreet, Inc. ("TrackStreet") is a Delaware corporate with its primary place of business at 9811 W. Charleston Blvd., Suite 2-776, Las Vegas, Nevada.

9

TrackStreet created and provided software to Defendants that allowed them to police and enforce their MAP policies in order to raise prices on Archery Products. Throughout the Class Period, TrackStreet participated in the conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

## IV.    FACTUAL ALLEGATIONS

### A.    The Archery Trade Association Performed a Central Role in the Conspiracy

#### 1.    The Membership in the ATA

34.    The ATA is the largest and most dominant trade group for the manufacturers and retailers of Archery Products. Only archery products manufacturers and retailers can join the ATA.  ATA membership has risen from 505 members in 2000 to over 2,500 members in 2023.

35.    Many ATA members are horizontal competitors along multiple levels of the Archery Products supply chain, and 80% of the ATA's members participate in the Archery Products supply chain, including manufacturers, distributors, and retailers.

36.    Membership in the ATA requires the review and verification of an application.  ATA membership categories include: Retailers & Range, Manufacturers & Distributors, Archery Service Professionals, Media, Sales Representative, and others.

37.    Membership in the ATA allows access to member-only benefits like attending the ATA Trade Show, use of the ATA Connect online forum, and a Member Directory.ATA member-exclusive events and resources allow horizontal competitors to discuss shared financial interests regarding Archery Products..

## 2.   The ATA's Board of Directors

38.    The ATA's Board "guides ATA actions and shapes the organization's policies and positions."

39.    At all times relevant to the complaint, horizontal competitors sat on the ATA Board of Directors. Manufacturer Defendants BowTech, Hoyt, Lancaster, Matthews, and PSE were Board members in 2018 and 2019. Retailer Defendants BPS, Cabela's, Jay's Sporting Goods, and Kinsey's were all on the Board in 2015, with multiple of these Defendants on the Board in each year from 2014-2024.

40.    Members of the ATA's Board of Directors have openly supported strict enforcement of the MAP policies. One ATA Board member credited enforcement of the MAP policies as a big part of his company's high sales.

> We're doing everything we can to enforce our MAP guidelines, and people know we take it seriously. Every two weeks we actively go after everything we can find on the internet. We have an in-house guy who stays after it. You need to watch and learn how their operations work. When we figure out what they're doing we cut them off.

41.    The ATA, under the direction of its would-be-competitor Board members, has promulgated anticompetitive rules and guidelines, including MAPs, to artificially decrease competition and increase prices in the Archery Products market in the United States.

## 3.    The ATA's Retail Council

42.    In 2016, the ATA revitalized its Retail Council to "improve the industry's archery and bowhunting markets." Multiple Defendants have participated in the Retail Counsil throughout the conspiracy.

43.    The Retail Council "meets weekly to discuss pressing issues raised during strategic-planning meeting[s]", including MAP policies and their enforcement. Kurt Smith, the ATA's Director of Industry Relations for the Retail Council has called MAP policies "probably one of the most talked about topics in the archery industry." His advice to retailers was to establish and enforce MAP policies so "distributors and retailers [can] catch violators [and] cut them out of the supply chain and force them to look for easier prey."

44.    Other Retail Council members recognized the benefits of MAP policies. Support for MAP policies came from one Retail Council member who said that Archery Products manufacturers "should create MAP policies and retailers should honor them . . . **every business** *must work together as a group to be productive and profitable,* ***which includes strong MAP policies and procedures***." Another member of the ATA's Retail Council warned that "***disobeying MAP policies . . . can have big consequences***."

45.    The then-General Manager of Defendants Jay's Sporting Goods, who was a member of both the Retail Council and the ATA's Executive Board Committee, described the benefits of Retail Council: "We've needed an active and engaged platform for retailers to discuss important issues where the conversation is educational and productive . . . I'm appealing to every archery retailer to use our backbone to step up and be part of the solution."

### 4.    The ATAs Trade Shows

46.     The ATA hosts an annual Trade Show.  Since 2011, the Trade Show has been open only ATA members "prevent[] the attendance of those who undercut the ATA's pro shop dealers. . . ."

47.     The ATA Trade Show brings together competitors from each level of the Archery Products supply chain and are very popular: the 2016 Trade Show, for example. was attended by more than 1100 companies.

48.     Defendants recognize that the ATA Trade Show is a good opportunity to meet with competitors.   For example, Defendant Jay's Sporting Goods General Manager, Mark Copeland, stated "[t]he Trade Show is the one place where nearly everyone in our industry does business . . . . It provides the perfect opportunity for retailers to talk face to face with Retail Council members. The retailer is in the trenches every day working to develop archers. To better our industry, we'd love to know what topics we should take to the ATA Board on your behalf."

49.     The Trade Show also provide an opportunity to discuss MAP polices.   For example, a leading archery company posted placards around its booth at one Trade Show warning retailers "that it aggressively enforces its MAP policies."

**B.     Defendants' Agreement to Artificially Raise, Fix, Maintain, or Stabilize Prices of Archery Products**

50.     Since at least January 1, 2014, Defendants have agreed, combined, or conspired to artificially raise, fix, maintain, or stabilize prices of Archery Products in the United States. To implement their unlawful contract, combination, or conspiracy, the Manufacturer and Retailer Defendants – acting through and with the aid of ATA and co-

conspirators – agreed to implement and strictly enforce MAP policies for Archery Products. The intent and result of this conspiracy was that prices for Archery Products were artificially inflated throughout the Class Period.

### 1.    The ATA Begins Actively Pushing MAP Policies Across the Archery Products Industry

51.    Although MAPs had existed in the Archery Product industry prior to the conspiracy, their effect was minimal and inconsistent because not enough Archery Products manufacturers and Retailers adered to those policies.  As a 2011 ATA briefing noted, the industry faced "limitations that restrict individual companies from stopping price cutting by some product resellers."

52.    Thus, Defendants were concerned that competition was lowering prices of and decreasing profit margins for Archery Products. In 2011, ATA members expressed concern about profitability in the industry with the ATA reacting to an email from one retailer stating "[w]e're concerned about MAP largely because it relates to the profitability of retail sales in our industry." Then-CEO and President of ATA Jay McAninch warned that "[w]ithout MAP, many of these 'bricks and mortar' dealers won't be able to stay in business."

53.    Throughout the early 2010s, the failure of a critical mass of manufacturers and retailers to to implement and enforce MAP policies ensured that there was price competition in the industry.

54.    The ATA did not take a position on the need for MAP policies.  "The only action the ATA has taken or intends to take [regarding MAP policies] involves providing

all ATA members a chance to have a voice and weigh in on MAP, which is a highly sensitive and potentially controversial issue."

55.    Indeed, one ATA Board member stated "[t]here is nothing the ATA can legally do when it comes to enforcement. There's no rule the ATA can set down and say 'This is what you must do.'"

56.    In the face of increasing pressure by ATA members on the ATA to facilitate industry-wide action regarding MAP policies, the ATA drastically revised its position a short time later.  In 2014, shortly after representatives from Defendants Cabela's and Bass Pro Shops joined the ATA Board of Directors, the ATA stated that all members should adopt and enforce MAP policies.

57.    The addition of represenatiaves from Defendants Cabela's and Bass Pro Shops was a crucial factor in ATA's change of position.   According to the ATA's CEO/President, Tom McAninch:

> I have to say that if anyone other than [Cabela's] Tom Gallagher had been involved, we would not have had such a smooth and productive first year. With his cohort in crime, [Bass Pro Shops'] Dean Snelson, Tom quietly and in his unassuming, disarming way (which is his manner) allowed our Board members to see that the box stores [Cabela's and Bass Pro Shops] shared in our future and, more important, *were serious about contributing to the success of the archery and bowhunting industry*.

58.    With representatives of two of the largest retailers of Archery Products now sitting on the ATA's Board of Directors, , industry participants had much greater assurance that if they adopted and enforced MAP policies, their competition would as well.

15

## 2.    The ATA Issues Call to Action on Adherence to and Endorsement of MAP Policies for the Archery Products Industry

59.    The ATA continued to advocate for a unified adoption of MAP policies.    In December, 2014, ATA CEO Jay McAninch published a blog post on the ATA website titled "MAP: United We Stand, Divided We Fall." The post highlighted the ATA's view MAP policies would benefit the industry only if every manufacturer and retailer agreed to participate.    To that end, McAninch invited and encourages other manufacturers and retailers to agree to these policies:

> Unfortunately, this unprecedented interest [in archery equipment] has increased competition so much that some companies ignore MAP (minimum advertised price) just to make a sale. . . .
>
> ***MAP has been controversial largely because it's associated with price fixing, which means setting a minimum or maximum price for selling consumer goods***. It's a complicated law, and recent Supreme Court decisions are causing ripples throughout lower courts and consumer-advocacy groups. . . .
>
> I believe to deal with this MAP issue, our industry must hold an open, honest dialogue about it**. *Everyone must participate because if we don't address the damage to our business model,*** we risk losing in the long term the sustained growth we've enjoyed. Since this involves everyone ***the ATA is the right group to facilitate this discussion and provide the vehicle for the industry to unite*** behind constructive, positive changes.
>
> To ensure the industry addresses these issues, we've engaged the ATA Board of Directors; and the leaders of [buying groups] ARRO [Archery Range and Retail Organization], NABA [National Archery Buyers Association], NBS [Nation's Best Sports] and Sports Inc. We've also included manufacturers and distributors who expressed interest in MAP***. In the months ahead, we'll facilitate a dialogue that examines what our industry's business leaders think can and should be done about MAP.*** To that end, the ATA will offer offer our MAP policy as a template that companies can use as a tool if they take action.

16

*We can't solve industry problems until we involve everyone in a conversation that shares concerns and develops a course of action.* This first step basically "turns on the lights" because it requires everyone to share what they think about this issue's impacts on our industry. Once we have a clear sense sense of what MAP is about for ATA members, we can start a process that deals with it.

60.     In support of its call for industry action, the ATA created a draft MAP policy designed "to protect our companies from state and federal legal actions, while clearly informing other companies of their unilateral policy on product pricing." ATA also created a checklist of key considerations "for forming – and enforcing – a sound, effective MAP policy."

61.     At the ATA Trade Show the following year, ATA hosted a lunchtime seminar on creating and enforcing MAP policies. The seminar was attended by approximately 60 ATA members, including manufacturers, distributors and retailers.

62.     A subsequent ATA newsletter reported "[*i*]*f ATA members want to control the minimum advertised price (MAP) and/or the minimum resale price (MRP) of their products*, each business *must create* its own policy statement, issue it to all resellers, *and then enforce it consistently and forcefully with no negotiations*."

63.     The newsletter described that the ATA counselled those members – competitors throughout the Archery Product supply chain – on "crafting customized policies to protect each product's publicly advertised minimum price. . . . Companies that don't set MAP/MRPs and enforce enforce them risk profit losses as well as diminish their brand."

17

64.    The February 6, 2015 newsletter expanded on the MAP training given to those attendees, presumably in order to reach manufacturers and retailers who did not attend the in-person training. "The ATA cannot set or enforce MAP/MRP policies for the industry because it would violate antitrust laws. However, the ATA can provide help and information so individual manufacturers can craft their own policies, which the companies must then enforce themselves."

65.    ATA's push for industry-wide adoption gained traction, with Kinsey's announcing a new and updated MAP Policy in June of 2015. In a press release in *Archery Wire*, Defendant Kinsey's explained:

> MAP policies exist to benefit both retailers and manufacturers by elevating perception of brand value, which leads to increased margins for retailers. Kinsey's stands behind manufacturers in their implementation of minimum advertised pricing to protect the interests of their brands, as well as margin integrity within the retail network.

66.    The June 2015 *Archery Wire* article also highlighted another central component of Defendants' conspiracy: because many product purchase Archery Products from distributors or retailers (such as the Retailer Defendants) rather than directly from the manufacturers, the price floors established by the MAP policies would only be effective if the distributors or retailers vigilantly policed the manufacturers' MAP policies. The article explained that, as part of its MAP policy updates, it would police the MAP policies of Archery Products manufacturers, such as TenPoint Crossbow Technologies. TenPoint Vice President stated "Kinsey's has done a great job of backing TenPoint's enforcement of its MAP policy, thus strengthening the TenPoint brand as well as helping the retailers maintain

a solid profit margin. This MAP enforcement is important in order keep the retailer base,

and archery as a whole, healthy."

67.     For example, in 2017, T.R.U. Ball Archery Releases/Axcel Archery Sights

("T.R.U." enacted a MAP policy that policed pricing up and down the supply chain

**New MAP Violator:**

A warning will be issued. Violator will be evaluated in approximately two
weeks to determine if they have raised prices to MAP levels.

**Repeat MAP Violator:**
First repeat infraction – Violators who have been notified that they are below
MAP pricing within the last six months will be given a 48 hour warning to
raise prices to MAP levels. Violators who have not raised prices to MAP
levels after this time period will be placed on the T.R.U., Inc. Do Not Sell
List, which asks each distributor to immediately block supply of product, for
30 days

**Second repeat infraction** – Violators who have been listed on the T.R.U.,
Inc. Do Not Sell List within the last six months who knowingly lower their
prices below MAP level for a second time will be placed on the T.R.U., Inc.
Do Not Sell List, which asks each distributor to immediately block supply of
product, for 60 days.

**Three or more repeat infractions** – Violators who have been listed on the
T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower
their prices below MAP level for more than two times will be placed on the
T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately
block supply of product, for the greater of 60 days or until prices have been
raised to MAP levels for at least 30 days.

Distributors who sold T.R.U. Archery Products to other resellers (such as Cabela's

supplying a small pro shop faced additional limitations and penalties.

68.     In a June 23, 2015 post on industry forum Archery Talk, one retailer

remarked "My hope is that the the ATA association [sic] is succesful in establishing an

industry wide rule set that will be enforced industry wide."

19

### 3. The Archery Products Industry Embraces MAP Policies as Defendants Urge Their Continued Enforcement

69.     Reflecting on the impact of the ATA's 2014 push for industry-wide action on MAP policies, the ATA published an article on March 15, 2016 titled "ATA Members Weigh in on MAP," which summed up the progress in getting industry-wide acceptance of the MAP policies.  "More than one year later, there's still good news and bad. However, the ATA and its member companies have worked tirelessly to discuss, craft and enforce MAP policies that could help manufacturers, retailers and the industry."

70.     The article quoted several industry participants, including Mike Ellig, founder of Archery Products manufacturer Black Gold Inc. Ellig recognized the ATA's efforts as pivotal in allowing his business to maintain higher prices:

> [I]n 2014, I spoke with Jay McAninsch about creating a MPS policy.... I was ready to charge ahead, but as a small-business owner, I didn't know where to start and I didn't have two months to create a policy from scratch.
>
> *                    *                    *
>
> Black Gold's MAP policy has been in place about two years. Ellig said he notices more companies adhering to the MAP policy, and also has "cut off" people who wouldn't abide by it.

71.     Ellig also noted that collective action on MAP policies would benefit the industry as a whole through higher prices, even if it meant that individual manufacturers or retailers sacrificed profits in the short term. The ATA article reported: "Enforcing MAP is up to every individual company," Ellig said. "It's a lot of extra effort. A lot of people will decide it's not worth the hassle because it's so much work. Some won't take time to

20

do it, but **the long-term impact of doing it right is 10 times greater than the short-term impact of getting a sale for the archery industry**."

72.    One Archery Products retailer and member of an archery retailer buying group known as ARRO stated "[w]e have to educate our dealers about holding to the MAP as much as they can . . . [o]therwise (violators will) destroy the brick-and-mortar stores."

73.    This same retailer noted two "MAP Issues": first, "[m]any sellers dodge MAP by selling a product and offering a $50 coupon or gift card. They sell the product so low that other retailers can't compete;" and second, "[s]ome manufacturers take the time and trouble to create MAP policies,only to find they can't enforce them. That's really disappointing."

74.    These issues are especially notable because they belie the true purpose of MAP policies within the Archery Products industry – to stifle free competition that would result in better prices for consumers. They are also notable for the frank conclusion offered about the role of the ATA in the conspiracy:

> "It will take the ATA's power to educate retailers and manufacturers about the importance of upholding MAP policies," Stubstad said. "The cost of business continues to rise. ***For businesses to survive, we can't give our products and services away. Manufacturers must approach this problem like it's enforceable and be determined to enforce their policies***."

75.    In that same article, Ben Summers, the then-vice chairman of the ATA Board of Directors  and also the director of operations at manufacturer T.R.U. Ball Archery, discussed MAP policies from the perspective of a "large manufacturer." Summers was concerned that without active enforcement, competitors would "cheat" on the agreement and steal sales and market share by offering lower prices. Summers stated "[i]f I'm really

21

good at keeping my products at the MAP price, and I have a competitor who isn't keeping a MAP policy, and their product costs less than mine, I can lose lots of sales." But Summers noted that the ATA played the critical role of enforcer:

> Jay McAninch always talks about **shining light in dark corners so people can be seen for what they're doing, and be held accountable**," Summers said. "ATA's lawyers have shone that light by offering information on how to structure a MAP policy, providing examples of policies from other industries, and explaining different tactics some companies use.

76.    Bruce Hudalla, from Hudalla Associates, which "helps manufacturers with MAP policies, and also tries to ensure retailer follow MAP policies," emphasized the importance of MAP policies:

> MAP is a good thing for the archery industry . . . . It keeps a level playing field and allows people to compete on product knowledge and customer service. As a sales rep, I support MAP because it maintains the value of products and allows my customers – retailers and manufacturers – to operate at profitable margins.

77.    Hudallah continued, stressing the central role of ATA in facilitating industry-wide action on MAP policies:  "ATA has done an excellent job getting all the main players from retailers to manufacturers to sales reps in the same room and presenting the facts and sample policies," and that "[i]f you have a [MAP] policy, it must be enforced."

78.    The ATA article also quoted Jay Scholes, co-founder of marketing firm Outtech: "We're responsible for upholding our sport, for making sure our retailers make money, and ensuring manufacturers also make money. MAP is a good thing for our industry." He concluded, "If we all believe we're in this business because we love the outdoors, we have a responsibility to uphold MAP to strengthen the industry." Scholes also

praised McAninch and the ATA "for facilitating conversations between retailer and manufacturers, and for cutting through misinformation about MAP to present the truth.

79.    At the 2016 ATA Trade Show, one Archery Products retailer gave a presentation on MAP policies, remarking that "many dealers might not know how to price certain products, but MAP helps them learn what profit margin they need to make their business ssurvive," and "We have to educate our dealers about holding to the MAP as much as they can . . . [o]therwise [violators will] destroy the brick-and-mortar stores." One attendee at the 2016 Trade Show remarked, *"[t]he archery industry is uniting as one*, understanding we are all in this together, and that *unity is ultimately what will help us grow*."

80.    The President of ARRO, an archery retailer group, presented at the 2016 ATA Trade Show about increasing ATA retailers' profit margins through MAP enforcement by manufacturers, and MAP adherence by retailers. ARRO's President identified the ATA as the key mechanism to achieve these ends, stating, "It will take the ATA's power to educate retailers and manufacturers about the importance of upholding MAP policies."

81.    The ATA rolled out a new suite of resources for "Members Interested in MAP Policies," including "ATA ... resources about creating a MAP policy for your company" and which were "available only to ATA members, and are included in your membership."

82.    In May 2016, the ATA met for a "strategic-planning" meeting in Minneapolis, Minnesota. As a result of this meeting, the ATA's Board of Directors

reinstated its Retail Council, to "improve the industry's archery and bowhunting markets." The new Retail Council gave retailers additional influence and power over ATA decision-making. Among the leaders of the Retail Council at this summit was Mark Copeland , the Council Chairman and also the General Manager of Defendant Jay's Sporting Goods, who described the expanding role of retailers within the ATA: "We've needed an active and engaged platform for retailers to discuss important issues where the conversation is educational and productive . . . . I'm appealing to every archery retailer to use our backbone to step up and be part of the solution."

83.    In an August 30, 2016 article in Inside Archery, ATA President Jay McAninch noted that as a result of the May 2016 meeting, "[t]hings are changing . . . . It's clear from our strategic planning meeting that our industry understands that its success depends largely on the success of archery and bowhunting retailers. The ATA's Retail Council is rejuvenated, highly engaged and ready to help forge a better future for everyone in our industry." Copeland emphasized the role of the Retail Council as a conduit for collective industry action: "I keep hearing that retailers are the industry's backbone. I'm appealing to every archery retailer to use our backbone **to step up and be part of the solution**."

84.    Industry participants continued to emphasize the need for vigilant enforcement of MAP policies. In early 2017, ATA published an article titled "ATA Members Speak: Marketing, MAP, and What's Next." Asked the question "Minimized [sic] Advertised Price enforcement is a hot topic these days. What's your take on MAP and why?" one Archery Products retailer stated:

24

We appreciate MAP policies and the companies that enforce them. When a company competitor company enforces a MAP policy, we can stay profitable without having the showroom for a competitor who MAP who wants to undercut pricing. ***We started to discontinue stocking manufacturers who do not have MAP policies policies and don't enforce them***, and those who supply Amazon.

85.    Asked "[i]f you could play king/queen for a day, what needs to happen in the archery industry to benefit your company the most?" this same retailer stated "We... need manufacturers who are willing to enforce their MAP policies, not those who just say they have MAP policies but don't do anything about price games."

86.    In July 2017, the ATA Board of Directors met at the headquarters of Defendant Hoyt and unanimously voted to add two seats to the Board for representatives from two Archery Products buying groups: the National Archery Buyers' Association ("NABA") and the Archery Range and Retailers Organization ("ARRO"). With the addition of those two organization, ATA Board of Directors consisted of "three pro shops, two buying groups, one sales representative, two multi-channel retailers, and 12 archery and bowhunting manufacturers and distributors."

87.    The executive secretary of ARRO noted that  the "ATA has been a force in growing archery and bowhunting in recent years . . . . It's been working to help retailers be more profitable." She also expressed her hope that the Board appointment strengthens the relationship and communication between ARRO, ATA and manufacturers."

88.    Shortly after that meeting, ATA published an article titled "MAP: What is it? Why Does it Exist?" The article continued the near constant signaling from the ATA that its members must adopt MAP policies and providing the assurance that their

competitors will do the same. In that article, the ATA urged retail members to "follow[] good MAP policies, which means those enforced by manufacturers. When you're part of the solution, you'll make more money." In addition, the ATA told its retail members: "If a manufacturer doesn't have a policy, or doesn't enforce its policy, call the company and express your concerns. Encourage them to work with the ATA to develop a MAP policy or improve their current policy." The ATA further explained that MAP policies "***level the playing field for all retailers, and eliminate the 'race to the bottom' that would manufacturers would occur if retailers endlessly competed to reduce prices***." Similarly, the ATA explained that "MAP . . . policies help retailers stay in tune with the market and margin expectations. In other words, if you understand and follow a manufacturer's MAP policy, you'll be better positioned to make more money and run a successful business."

89.    The article again highlighted ATA's central role in the conspiracy:

> The Archery Trade Association's Board of Directors and its Retail Council to members are discussing how to solve solve those problems and ensure the longevity of brick-and-mortar retailers, who form the industry's core. ATA members regularly weigh in on MAP, and the conversation continues. **While the ATA works with manufacturers to establish and enforce good MAP policies**, you can get involved in several ways.

90.    In that article, the ATA stressed the importance of its manufacturer members adopting, implementing and enforcing MAP policies, and encouraged  its retailer members to support manufacturers in this regard.  The ATA encouraged members to "[s]tart by following good MAP policies, which means those enforced by manufacturers." The ATA also stated, " If a manufacturer doesn't have a policy, or doesn't enforce its policy, call the company and express your concerns. Encourage them to work with the ATA to develop a

MAP policy or improve their current policy."  One member of the ATA Retail Council echoed these goals for retailers, "encourage[ing] retailers to request MAP policies from manufacturers, and open the lines of communication. Then, adhere to those policies and improve the archery and bowhunting industry's long-term success."

91.    Some members of the Retail Council were more explicit.  Ryan Shutts, the merchandising director of Defendant Cabela's, "said *every business in the industry must work together as a group to be productive and profitable*, which includes strong MAP policies and procedures."

92.    Finally, the article drew a straight line from adherence and strict enforcement of MAP polices to  increased pricing.  Specifically, the article noted that MAP policies "help retailers stay in tune with the market and *margin expectations*. In other words, if you understand and follow a manufacturer's MAP policy, you'll be better positioned to make more money and run a successful business," and that  "[i]f you follow MAP and work within that price structure . . . [t]hat puts you in a better position financially *than cutting the cost of a product and disobeying MAP policies, which can have big consequences*;" and concluded, "[w]hen you're part of the solution, you'll make more money."

### 4.    The ATA Provides Additional Resources that Facilitate the Conspiracy to Fix Prices and Exchange Competitively Sensitive Information of Archery Products

93.    In October 2017, the ATA collected and provided new resources for ATA members by creating a members-only "MAP Resource Library."

> This MAP Resources Library helps retailers learn which manufacturers have MAP policies, and helps retailers to understand and comply with them.

27

Several policies are already posted, and the ATA will add more as manufacturers provide them.

***If you're a manufacturer and need help monitoring how well retailers adhere to your MAP policy, the ATA can help you, too**. **MAP policies are only effective if they're enforced, but monitoring and enforcing them can be challenging**. **To help, ATA has secured special discounts with firms that monitor and enforce MAP policies. These discounts are available only to ATA-member manufacturers.***

***The ATA has asked all ATA-member manufacturers to provide their policies so they can be included in the MAP Resource Library**.* If your company has a MAP policy, or if you have questions, contact Wendy Lang, ATA membership manager, at wendylang@archerytrade.org. To capitalize on these ATA-member benefits, join the Archery Trade Association today.

94.    This centralized repository for MAP policies was not only a resource for industry participants,  but also a list of competitors who agreed to limit price competition for Archery Prouducts by agreeing to price floors.   In a truly competitive market without the facilitation of the ATA, these industry participants would not institute price floors on their products because they could not be certain that their competitors would not undercut their prices and steal business.

95.    The firms that ATA references to help ATA members "monitor and enforce MAP policies" were co-conspirators TrackStreet and Oris. Both of these companies' programs featured digital platforms that enable users to track and enforce pricing policies, including MAP policies.

96.    In a 2019 ATA article, the ATA described TrackStreet and Oris as providing advanced software that searched the internet for violations of MAP policies, stating that TrackStreet and Oris "know how to find out who's violating [MAP], identify their fictitious names, and track them as they move around to undercut our members."

28

97.    On information and belief, the services for which ATA had negotiated a discount from Oris and TrackStreet and which it recommended to ATA members not only identified MAP violators, but also sent violation notices to all MAP violators and tracking information on seller violations such as when and how often the seller violated MAP.

98.    In addition to creating the MAP Resource Library, the ATA created a new page on its website specifically for Minimum Advertised Pricing. The webpage – deleted at some point in 2021 – described how a MAP policy "***ensures all retailers compete fairly and evenly on service instead of price***." It also took the unequivocal position that "[r]etailers are responsible for knowing MAP policies ***and adhering to them***."

99.    In November 2017, ATA released ATA Connect, available only to members. The ATA touted ATA Connect as "a new online discussion community created exclusively for ATA members. It's a safe, ***confidential space to network and solve industry challenges through constructive discussions***."

100.    In an ATA article published to announce the release of ATA Connect, the ATA stated "[u]sing ATA Connect, work with your peers to find solutions that boost business and benefit the industry by tackling topics like MAP policies, buying patterns, and setting appropriate charges for service work."

101.    A subsequent blog post by ATA CEO Matt Kormann verified that ATA members did, in fact, use ATA Connect to discuss MAP policies: "The topic atop the list of many ATA members during and immediately after #ATA2019 has been internet retailing and minimum advertised pricing. **ATA Connect participants have been discussing both topics**, with retailers and manufacturers alike vocal in their opinions."

29

102.    In 2019, ATA noted that "[t]he hottest current topic on ATA Connect is managing inventory as new compound bows hit the market. ***Retailers are also discussing ways to communicate with suppliers to ensure positive, profitable partnerships***."

103.    In May 2018, the ATA Retail Council met near Alma, Wisconsin, where they discussed inter alia, topics they expected retailers to discuss on ATA Connect, which included:

> making money from your wrenches and work bench,
> how ATA ePro helps archery retailers,
> minimum advertised price policies,
> new-product release dates,
> setting profitable sales margins,
> vetting and hiring employees,
> finding and compensating good bow techs,
> evaluating your store's market value,
> boosting profits from lanes and lessons,
> Do online sales really hurt your business?

104.    ATA also created ATA Connect's Retail Growth Interact, a channel only available to ATA-member retailers. As the ATA explained to members:

> Retail Growth Interact is a great place to share ideas and ask questions about the topics that matter most to your business, including buying patters [sic], profit margins and what to charge for services. Together we can address industry challenges, boost your bottom line, and promote archery and bowhunting.

105.    Shortly after the release of the Retail Growth Interact, the ATA announced that it was also releasing another members-only channel, My ATA Network.

> Distributors, manufacturers, retailers and other ATA members have different business goals, objectives and operations. That's why the ATA is creating My ATA Network, an open forum that helps all ATA members work together to grow archery and bowhunting participation while boosting their businesses.

106.    By at least 2019, Defendants had achieved the critical mass of industry participation that made their MAP policies effective at artificially raising prices. In a 2019 ATA article titled "Effective MAP Programs Mean Nonstop Enforcement," the ATA "urge[d] retailers and distributors to notify manufacturers of [MAP] violations, and provide as many specifics as possible," and explained: "The big thing will always be communication and teamwork . . . . Enforcing MAP will never get easier. That's why it's so important for ATA members to work together as much as possible."

107.    In that same article, T.R.U.'s Ben Summers stated that "good MAP policies and relentless enforcement played a big part in the company's 'really high' sales the past year," and manufacturer TenPoint's Customer Relations and Training Director, Barb Terry, "encourages its retailers to be MAP watchdogs" because "[s]maller dealers can't compete with people who drop their prices below MAP," and that "[i]f they notify us, we'll follow up on it" because "[w]e don't want to see someone take money out of our customers' pockets."

108.    The conspiracy required constant policing of MAP policies and exposing and punishing retailers or distributors who attempt to undercut competitors' prices. ATA's Director of Industry Relations, Kurt Smith, described that monitoring adherence to MAP policies was "a constant whack-a-mole or cat-and-mouse game with people who just want to make a quick buck," and people "who aren't worried about long-term profitability."

109.    Smith noted the continued need for competitors at every level of the supply chain to work together for the MAP policies to be effective at raising prices, stating "[t]he big thing will always be communication and teamwork," because "[e]nforcing MAP will

never get easier. That's why it's so important for ATA members to work together as much as possible."

110.    On March 20, 2019, Smith hosted TrackStreet's Ryan Erickson on the official ATA podcast Beyond the Bow for an episode titled "MAP Policies and Enforcement." Erickson commented on the Archery Products industry was able to effectively raise prices through collective adherence to and enforcement of MAP policies because "nobody wants to be the first soldier through the way . . . they tend not to turn out too well . . . [but] as soon *as a couple of big brands hop on, then all of a sudden that provides an umbrella coverage for the rest of the brands to move forward*." He concluded, "the only thinking worse than not have a MAP policy as a brand is having one and not enforcing it" and that "we have all agreed that this is the right thing, so now we have to finish this up."

111.    In August 2019, Inside *Archery* included a front page story titled "Kinsey's: Branching Out, But True to Its Roots," noting Defendant Kinsey's MAP:

> Kinsey's is using its far-reaching influence to help enforce MAP policy. This effort is also geared towards helping dealers and strengthening the industry at large.
>
> "We work closely with our vendor partners and retail partners to monitor and enforce MAP policy," [Kinsey's CEO] Justin Gorman said. "There are a lot of methods out there, and there really is no simple solution*, but by working together, we have the ability to bring positive change to the industry.*"

112.    Gorman described Kinsey's efforts to track and punish industry participants who violate MAP policies, stating "[w]hen someone breaks the rules, they lose the ability

to buy that product from us. They also can't buy it online or through the manufacturer because we work closely with vendors to build a 'do-not-sell' list."

113.    Finally, Gorman described the need for industry-wide support to ensure the effectiveness of the MAP policies.  "Kinsey's certainly can't solve this problem by itself. Everyone needs to pull their own weight, but we are doing all we can to help protect the honest shops that don't violate MAP, which are the shops that actually get hurt when someone else breaks the rules."

114.    Just a few months later, *Inside Archery* published an article quoting the then-General-Manager of Defendant PSE, extolling the need for collective action.  "The industry is in a hard place, but we are not going to wait for anyone else to fix it for us. We are going to make it part of PSE's business strategy to drive improvement and fix everything we can. ***And we are doing all of this while fully acknowledging that if we are successful, then we are also benefiting our competitors***."

115.    Defendants continued to use the ATA and other industry publications to signal to the market and their co-conspirators their adherence to raising prices through MAP policies. In 2020, ATA CEO Matt Kormann  justified the perceived necessity of MAP policies in the digital age in a blog post titled "CEO Blog: Importance of MAP":

> Buying habits have also changed for consumers and business owners. We can't turn back the clock and delete the internet – no matter how appealing that might sound, especially to parents. That evolution keeps MAP in a spotlight. With just a couple of taps on an iPhone we can pull up our competitors' retail pricing. For pro shops, that means it's easier to identify potential violations of MAP policies.
>
> The first reaction might seem obvious: Manufacturers with solid MAP policies should be out there policing their retail channels. The reality is more

complex. Doing so takes time and resources during a stretch in our industry where both are at premiums. It might be even more simple to assume every retailer should just follow those policies, but as long as we live in a free and competitive market, some business owners will make decisions others might not like.

116. In another example of using trade publications and the ATA to publicly demonstrate support for and adherence to the MAP policy, – an industry sales consultant firm MWS Associates, Inc. was quoted in a since-deleted 2021 post on the ATA website:

> We're all competitors, and we compete against each other throughout the season and the years. But we must grow the numbers in the industry, and to do that we must work together . . . . Realistically, the ATA does so much for the growth and health of the industry, and I think that largely goes unrecognized. Although we're all competitors in the industry, we all have the same goal, and that's to help the industry succeed. The ATA works on that, and reminds us to see the bigger picture.

117. As of this filing, the ATA's website continues to maintain its webpages discussing MAP and offering various related resources.

### 5. The ATA Launches Members-Only ATA Retail Business Tracker Survey.

118. In 2022, ATA announced the release of the ATA Retail Business Tracker Survey:

> As an archery business, data and reliable facts play a pivotal role in making critical decisions. To address that need, the ATA is launching a new quarterly survey to gain insight from retailers across the country to help members adapt to changing conditions regionally as well as to compare your business to what is happening nationally.

119. In a subsequent article , titled "ATA Members Capitalize on Data Shared in ATA's Retail Trend Tracker Survey," the ATA explained the process and aims of the survey:

34

The ATA puts together a Retail Trend Tracker survey each quarter and sends the questionnaire to retail members in order to curate relevant and informative data about the state of the industry according to the retail shops' experience. The ATA then shares the data gathered from the survey with distributors, manufacturers and retailers in an easily digestible report. The data is provided collectively for each region.

120.    According to the article, the ATA intended its members to use the survey data to compare their business regional competitors, explaining that "[s]ince each region of the country is represented in the report, retailers and manufacturers can study any discrepancies in the results and adjust accordingly, based on the data in their region."

121.    A different ATA article, titled "Download the Latest ATA Retail Trend Tracker Survey for Valuable Data about Market Trends," the ATA boasts that "[t]his data allows you to see how your shop compares to your peer" and describes the granularity of the information provided in these surveys, which includes, *inter alia*,

- the percentage of merchandise sales by product category, types of bows, price ranges of bows, customer experience level, and foot traffic;

- seasonal questions regarding what's trending and what's not, business challenges and what customers are saying;

- which price range customers are gravitating toward, as well as the percentage of sales of each product type; bows, arrows, accessories, and services such as coaching or bow technician work.

122.    According to the ATA, manufacturers and retailers "can also get a sense of how much inventory they should have on hand. Comparing your inventory with that of

other shops in your region can help you determine whether what you have is working or give you a sense of how you might increase or decrease it."

123.    The intends its members to use this information to help set prices.  For example, in a similar report gathered from data compiled from ATA Retail Council Member surveys about the prices charged by ATA members for repairs and servicing of Archey Products, the ATA suggested the data could be used to "compare your service and labor rates to industry averages so you can see how you stack up against your peers." The article concluded, "Don't sell yourself short. If you provide quality service on time, price the work accordingly."

124.    The myriad ATA-created channels of communication between competitors, including the ATA Trade Shows, ATA Connect, ATA Retail Business Tracker, and other forms of communication described herein, are the means by which Defendants exchanged competitively-sensitive information.

**C.    Defendants' Suppression of Competition through Information Exchange**

125.    Defendants' information exchange suppresses competition  allowing competitively sensitive information to be used by competitors to adjust prices, supply, demand, inventory, and other key factors which results in higher prices for the consumer.

126.    Similarly, Retailer Defendants are some of the largest sellers of Archery Products in the country. The beginning of the conspiracy was marked in large part by the appointment of Retailer Defendants Cabela's and Bass Pro Shops to the ATA Board of Directors, which caused ATA President Tom McAninch to reflect on the "mega marts

36

joining into our industry discussions" which "allowed our Board members to see that the box stores [Cabela's and Bass Pro Shops] shared in our future and, more important, were serious about contributing to the success of the archery and bowhunting industry." Moreover, the Retailer Defendants also consistently held seats on the ATA Board of Directors and ATA Retail Council throughout the Class Period, which increased their already-large influence on the market for Archery Products.

127.    A critical factor in assessing the impact of Defendants' information exchange is the fact that the Retailer Defendants are competing for sales of *literally identical* products – the products manufacturerd by the Manufacturer Defendants. Therefore, the *only* way that the Retailer Defendants compete for those customers is through price, which is precisely the competition that Defendants sought to thwart through their conspiracy. As Defendants themselves acknowledged, "MAP policies level the playing field for all retailers, and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices."

128.    Competition is likely to be harmed where competitors exchange sensitive information on pricing and sales strategies. When Defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales or Archery Products.

129.    Competition was, in fact, harmed by Defendants' information exchange. ATA announced the stated purpose of ATA Connect, for example, to "work with your peers to find solutions that boost business and benefit the industry by tackling topics like MAP policies, buying patterns, and setting appropriate charges for service work." The

ATA advertised its Retail Growth Interact channel as a great place to share ideas and ask questions about the topics that matter most to your business, including buying patters [sic], profit margins and what to charge for services. Together we can address industry challenges, boost your bottom line, and promote archery and bowhunting."

130.    Defendants used the strategic information obtained through the ATA and its various channels detailed *infra* to reduce the uncertainty that they each should have faced from not knowing what their competitors were doing in the market. This strategic information was a material factor in their decisions to create and vigorously enforce MAPs on the Archery Products they manufactured and sold to customers. Thus, this knowledge tainted what should have been their independent decisions about the price and sales strategies of Archery Products.Defendants' information exchange was mutually-reinforcing with its agreement to raise prices through industry-wide MAP policies. For example, the regular exchange of information, including through ATA-created channels such as ATA Connect, the Retail Business Tracker Survey, the ATA Board of Directors and Retail Council – on which representatives from Manufacturer and Retail Defendants sit and meet regularly – and the ATA Trade Show, allow the Defendants to monitor one another's sales, prices, and other metrics to ensure that they are adhering to the conspiracy. Additionally, where Defendants do adhere to MAPs and only "compete fairly on service instead of price," the value of the information relating to the prices of services and other non-price variables – information that is explicitly exchanged through, inter alia, the Retail Business Tracker Survey – becomes especially valuable.

131.    The cumulative effect of Defendants' agreements is higher prices for consumers. A 2016 post on *Archery Talk* forum noted:

> Every dealer I have ever talked to thinks everything in archery is overpriced today, just as I do! Today vertical bows are exceeding 1000-1500 [dollars] on a regular basis, a dozen crossbow arrows are over $80 and can cost up to 250 if you want custom work, firenock arrows are over $600 a dozen, vertical arrows are exceeding $200 for hunting aroows, don't get me started on targed aroows, X10 Pro Tours are over $400 for bare shafts, points can be around $300. The average pay hasn't moved much in years.

132.    The retailer, a non-defendant retailer, concluded "[I]s archery overpriced[?] [A]bsolutely."

133.    A 2017 issue of Field & Stream Magazine reported on consumer attitudes towards bow prices, reporting that customers believed that the prices for compound bows were "obscene," "insane," and "out of touch," and quoted one retailer saying "Guys around here can't afford new bows anymore." It stated "[t]he least expensive of our top 12 bows last year listed at $949. The priciest was $1,500. Add in arrows and accessories, and you're looking at $1,200 to $2K."

**D.    Defendants' Conduct Has Had Anticompetitive Effects**

134.    Defendants' agreement to artificially raise, fix, maintain, or stabilize prices for Archery Products and to exchange competitively sensitive information regarding Archery Products has had the intended effect of artificially inflating the prices for Archery Products paid by consumers.

135.    Defendants' industry-wide MAP polices restrict compeititon and increase retail prices thourgh at least two mechanisms. First, these MAP policies eliminate the

ability of competitors to attract customers by publicly advertising lower prices. Second, even if some retailers offer discounts from the MAPs , the MAPs have already established artificially increased prices, ensuring that actual prices are higher than they would have been in a competitive "but for" world.

136.    The ATA admits that MAPs restrict competition and affect retail prices. According to the ATA: "A MAP policy ensures all retailers compete fairly and evenly on service instead of price"; "[MAP] policies level the playing field for all retailers, and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices"; "MAP policies help small businesses compete and sell on service and value, rather than waging price wars with other retailers."

137.    ATA members also admit that MAP policies affect retail prices. According to one ATA member: "MAP is a good thing for the archery industry" because "[i]t keeps a level playing field and allows people to compete on product knowledge and customer service" rather than on price.

138.    The Defendants' agreement to artificially raise prices through the adoption, implementation, and enforcement of industry-wide MAPs is therefore an agreement that has fixed, raised, maintained, or stabilized the retail prices of Archery Products sold in the United States.

139.    Indeed, Defendants' agreement to raise prices on Archery Products has had the intended effect. NABA – who has had seats on the ATA Board of Directors – stated that its members "stive for a minimum of 40% profit based on manufacturer's M.A.P[.]" Another retailer recognized the effect of these de-facto price floors on competition: "Most

archery shops are in areas where bow pricing is highly competitive from shop to shop. We all want to get the sale, but fortunately manufacturers set MAP pricing on bows, which mostly prevents one shop from grossly undercutting another on pricing. That way, we all get our piece of the pie."

### E.    The Relevant Market for the Conspiracy is the Market for Archery Products

140.    This action alleges that Defendants' coordinated horizontal conduct was a *per se* violation of the federal antitrust laws. Price fixing among horizontal competitors is per se illegal and plaintiffs need not allege or define a relevant market.

141.    Plaintiff also alleges that under Section 1 of the Sherman Act, Defendants' agreement to unlawfully exchange competitively sensitive information amongst Archery Products retailers and producers violates the rule of reason.

142.    A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). To the extent a relevant product market must be defined, the relevant market in this matter is the "Archery Products" market.   To the extent a relevant geographic market must be defined, the relevant market in this matter is the United States.

143.    There is a single product market for Archery Products. As alleged *infra*, the MAP policies created and enforced by Defendants applied to all categories and price points of Archery Products.

144.    "Archery Products" refers to products used by consumers for bowhunting or archery. For purposes of this action, Archery Products consists of five main product

markets, submarkets, or cluster markets: (1) bows—including compound bows, recurve bows, longbows, and crossbows—and their components; (2) arrows (minus the arrowhead) and their components, including the shaft, fletching, and nock; (3) arrowheads (or arrowpoints) including broadheads and field points; (4) targets, including bag targets, foam targets, and 3D targets; and (5) accessories, such as bow cases, arrow quivers, sights and scopes, and stabilizers. According to the ATA, in 2020, "[t]he US ha[d] 9.9 million bowhunters, 17.6 million recreational archers and 5.4 million competitive archers . . . ."

145.    Because Defendants conspired to raise prices through the adoption, implementation, and enforcement of MAPs on the Archery Products market in the United States, it is appropriate to analyze the competitive effects of the MAP policies on this market as a whole. That is, grouping these products into a single product market allows for an efficient analysis of the competitive effects of the industry-wide MAPs without any analytical difference.

146.    At all relevant times, Defendants and their co-conspirators collectively possessed market power at each and every level of the United States market for Archery Products, including the manufacturing, distribution, and retail sales level. That is, they maintained the ability to raise prices significantly above competitive levels profitably, without losing a commensurate number of sales.  Specifically and hypothetically, a firm that controlled a substantial share of the market for Archery Products, as Defendants and do, could profitably impose a small but significant non-transitory increase in prices for Archery Products. Due to the conduct challenged herein and other factors, consumers

would not be able to defeat such artificial price inflation by shifting to other companies or products.

## V.    FRAUDULENT CONCEALMENT & EQUITABLE TOLLING

147.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful conduct. Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful and anticompetitive conduct.

148.    Plaintiff and the Class did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conduct alleged herein prior to retaining counsel in 2024.

149.    The contract, combination, or conspiracy alleged herein was fraudulently concealed by Defendants throughout the Class Period by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, limitation of any explicit reference to competitor pricing, communications on documents, communication of competitively sensitive data to one another through the members-only ATA-created channels detailed herein, which kept both the content and identity of participants in the system secret, and the concealment of the existence and nature of their competitor price discussions from non-conspirators (including customers).

150.    Indeed, the very nature of Defendants' conspiracy was actively concealed by Defendants' use of the term "MAP" to describe what was actually a horizontal agreement to fix prices of Archery Products. Defendants used the term "MAP" to mislead customers

into believing that Defendants' illegal coordinated conduct was a legitimate business practice.

151.    Defendants also conducted the conspiracy through the ATA, which is members-only and whose Board of Directors and Retail Council meetings are closed even to most members.

152.    Similarly, many of the veiled references to the ATA's facilitation of the conspiracy were removed from their website around 2021 and, without further context, would have been insufficient to put consumers on notice of Defendants' conspiratorial actions.

153.    By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and Class Members have as a result of the unlawful contract, combination, or conspiracy alleged in this complaint.

## VI.    CONTINUING VIOLATION

154.    During the Class Period, Defendants continued to make sales to Plaintiff and Class Members of Archery Products whose prices were fixed as a result of Defendants' continually renewed and adjusted price-fixing and information exchange agreement. Defendants needed to continually renew and adjust their price fixing and information exchange agreement to account for ever-fluctuating economic and market conditions.

155.    Defendants' meetings and misrepresentations were overt acts that began a new statute of limitations because these events advanced the objectives of Defendants' conspiracy.

156.    Defendants' overt acts, which were new acts beyond the initial price fixing that were necessary to perpetuate Defendants' agreement, continued throughout the Class Period. Each sale of Archery Products by a Defendant at a supracompetitive price was a new overt act that was part of Defendants' antitrust violations that injured Plaintiff and Class Members and started the statutory period running again.

157.    Defendants' overt acts were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiff and Class Members.

158.    Further, each purchase by Plaintiff and Class Members through the Class Period of Defendants' Archery Products, the price which resulted from Defendants' continually renewed and adjusted price-fixing agreement, necessarily caused new and accumulating injury to Plaintiffs and class members.

159.    As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiff and Class Members starts the statutory period running again regardless of Plaintiff's knowledge of the alleged illegality at much earlier times. This means that each

illegally priced sale of Archery Products to Plaintiff and Class Members constituted a new cause of action for purposes of the statute of limitations.

## VII.    CLASS ACTION ALLEGATIONS

160.    Plaintiff brings this action individually and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking treble damages, injunctive relief, and other relief pursuant to federal antitrust laws on behalf of the members of the following class:

> All persons and entities in the United States and its territories that purchased archery equipment from Defendants, or from a division, subsidiary, predecessor, agent, or affiliate of such Defendant, at any time from January 1, 2014 until the present (the "Class Period").

> Specifically excluded from this Class are Defendants; their officers, directors, or employees; any entity in which a Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of a Defendant; any federal, state, or local governmental entities; any judicial officers presiding over this action and members of their immediate family and staff; and any juror assigned to this action.

161.    Plaintiff reserves the right to amend this Class definition, including, without limitation, the Class Period.

162.    **Numerosity**: The Class is so numerous that joinder of all members in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contain tens of thousands of similarly situated proposed Class members. Members are geographically dispersed throughout the United States, such that joinder of all Class Members would be impracticable The Class is readily identifiable and are ones for which records should exist.

46

163.    **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, like all class members, purchased Archery Products directly from one or more of the Manufacturer or Retailer Defendants and were damaged by the same common course of wrongful conduct, and the relief sought is common to the Class.

164.    **Commonality**: There are numerous questions of law or fact arising from Defendants' anticompetitive conduct that are commone to the Class, and which predominate over any questions affecting only individual Class Members, including, but not limited to:

a. Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of Archery Products sold in interstate commerce in the United States in violation of federal antitrust laws;

b. Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws;

c. Whether Defendants' and co-conspirators' conduct caused the prices of Archery Products sold in the United States to be sold at artificially high and supra-competitive levels;

d. The identity of the participants of the alleged conspiracy;

e. The scope and duration of the alleged conspiracy;

f. Whether the Plaintiff and the other members of the Class were injured by Defendants' and co-conspirators' conduct, and, if so, the appropriate classwide measure of damages for Class members;

47

g.  Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

h.  Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the Class.

165.  **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of other members of the Class and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

166.  **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impractical and Class Members do not have interests in individually controlling the prosecution of separate actions.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and the establishment of incompatible standards of conduct for Defendants and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

167.  **Injunctive Relief**: Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII.  CLAIMS FOR RELIEF

### COUNT 1
### Violation of Sections 1 and 3 of the Sherman Act
### Section 4 and 16 of the Clayton Act
### Agreements in Restraint of Trade
### (15 U.S.C. §§ 1, 3, 15(a), 26)

168.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

169.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2014, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Archery Products in the United States to supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

170.    This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a quick look or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, such justifications would have been reasonably achieved through less restrictive means of competition.

171.    The contract, combination, or conspiracy alleged herein has had the following effects, among others:

A. Price competition in the sale of Archery Products has been restrained, suppressed, and/or eliminated in the United States;

B. Prices for Archery Products sold by the Manufacturer or Retailer Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

C. Those who purchased Archery Products directly from the Manufacturer or Retailer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

172.    Plaintiff and Class Members have been injured and will continue to be injured in their businesses and property by paying more for Archery Products purchased directly from the Manufacturer or Retailer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

173.    Plaintiff and Class Members seek three times their damages caused by Defendant's violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendant from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

**COUNT 2**
**Violation of Section 1 of the Sherman Act**
**Exchange of Competitively Sensitive Information**
**U.S.C. § 1)**

174.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

175.   Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2014, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Archery Products in the United States to supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

176.   In furtherance of this scheme, Defendants and co-conspirators have agreed between and among themselves to exchange competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies.

177.   Defendants' information exchange has had the intended anti-competitive effects, including inter alia: (a) raising, fixing, maintaining, or stabilizing prices of Archery Products at an artificially high level; and (b) eliminating or suppressing, to a substantial degree, competition among the Manufacturer and Retailer Defendants for sales of Archery Products.

178.   Defendants' agreement, combination, and/or conspiracy to exchange competitively sensitive information violates Section 1 of the Sherman Act under either a "quick look," or "rule of reason" analysis because the exchange results in the described anticompetitive effects with no valid procompetitive justifications. Any proffered procompetitive justifications do not outweigh the anticompetitive effects and could have been reasonably achieved through means less restrictive of competition.

179.    Each Defendant and co-conspirator has participated in one or more overt acts in furtherance of the information exchange.

180.    As a direct and proximate result of Defendants' contract, combination, and conspiracy to exchange competitively sensitive information, Plaintiff and Class Members have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits. Absent the conspiracy to exchange competitively sensitive information, Plaintiff and Class Members would have paid less for Archery Products.

181.    Plaintiff and Class Members seek three times their damages caused by Defendant's violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendant from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

## IX.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully prays the Court enter judgement on his behalf and on behalf of the Class herein, adjudging and decreeing, as follows:

A.    This action may proceed as a class action, with Plaintiff as the designated Class representative and his counsel as Class Counsel

B.    Defendants and their co-conspirators have engaged in a contract, combination, and conspiracy in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and that Plaintiff and the members of the Class have been injured in their business and property as a result of Defendants' and their co-conspirators' violations;

C.    Plaintiff and the Class recover damages to the maximum extent allowed under federal law, and that a joint and several judgment in their favor be entered in favoir of Plaintiff and the Class against Defendants in an amount to be trebled to the extent such laws permit;

D.    Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.    That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of a company's information;

F.    That Plaintiff and the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.    That Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

H.    That Plaintiff and the Class have such other and further relief as the case may require and the Court may deem just and proper.

## X.    DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the Class, hereby requests a jury trial pursuant to Federal Rule Civil Procedure 38(b) on any and all claims so triable.

Dated: August 7, 2025                    Respectfully submitted,

/s/    *Garrett D. Blanchfield*
Garrett D. Blanchfield (#209855)
Brant D. Penney (#316878)
Roberta A. Yard (#322295)
REINHARDT WENDORF & BLANCHFIELD
South 8th Street, Suite 90
Minneapolis, MN  55401
Tel:  (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

*Counsel for Plaintiff Tyler Swails and the Proposed Class*